Next case is 2012-1238 ADAMS & ASSOCIATES v. DELL COMPUTER Mr. Lemieux? Yes. Good morning, Your Honor. May it please the Court. I'm here in kind of a strange procedural position in that we had a full trial, and between the rendering of the jury verdict and the actual entry of judgment almost a year later, there was a settlement agreement that wiped out almost all bases of liability on behalf of my client, one of the other co-defendants. So what we have here is a situation. Is there any evidence left in this case on this record? Well, let me ask you about that, because that was a large chunk of your brief, and it was very difficult to get through it. One, because as I read your statements and your friend's statements, they seemed diametrically opposed in terms of what the facts were. Now you're saying, finally, in yellow, I guess, you say most, but not necessarily all. So I think you've backed off a little bit from your position in terms of whether everything was necessarily covered by the settlement, right? That's right. You equivocated a little bit in terms of 100% versus something a little less than that, right? It's less than 100%. I would say basically there's four types of evidence left to be looked at, Your Honor. Okay, but let me ask, just say, can you respond very briefly, because it seems like, unless I'm missing something, that really the response of your friend states facts. So it's really hard to displace that. The other question I have with regard to that is that the district court really didn't deal with that issue specifically, did he? I mean, all I can find in the record is he made a statement saying that he was denying your JAMAL and that he didn't think the settlement was relevant. But there's no analysis of that. Am I right about that? That's correct, Your Honor. Okay, so why don't you deal briefly with at least the diametrically opposed facts that each of you is coming forward with. Well, part of it, I guess, is I would urge Your Honors to simply look at the actual record. My opponent here has a habit of saying something is true, putting a citation next to it as if it actually occurs in the record, but if you actually go to that citation in the record, you find it has absolutely nothing to do with the point he claims it supports. And so there is a lot of faith in that report. Well, is it true or not that you said only the use and testing of wind bomb products were presented at trial? That is absolutely true. This whole trial was about whether or not Wind Bond, which is one of the other co-defendants in this case, made a Super I.O. controller and whether that Super I.O. controller violated or infringed the plaintiff's patents in this case. IT, another supplier of Super I.O. controllers, was separated out and bifurcated into a separate case, and there wasn't any evidence regarding any other type of Super I.O. other than those made by Wind Bond. The whole trial was about Wind Bond. And so when I say there are four types of evidence, perhaps this will help, Your Honor, in terms of understanding what it looks like. There is the evidence of Wind Bond. We used them in our motherboards. We sold them in the United States containing it. So there is Wind Bond evidence. I thought there were arguments that ACES brought some infringing test programs into the U.S. and used them as a test system. This is the next thing that I was going to, Your Honor, is that there is evidence of alleged infringing testing. Are you saying that evidence doesn't exist? I'm saying that evidence, Your Honor, actually was precluded by 35286. All of that evidence, if you look at the actual record evidence, the evidence of testing using the IFDC.EXE diagnostic tool all occurs in the year 2000. There's not a single piece of evidence in the record. But wait, we already had a jury trial. Did that evidence come in or was it excluded? It came in over our objections, Your Honor. And we argued and there was a jury instruction given that if it was prior to post six years of the filing of the suit, it shouldn't be the basis of any action. However, the jury apparently got confused about this because they still found that that was evidence of infringement, even though it's clearly excluded by Section 286. We have a limited amount of time. Do you mind if I move you on to spoliation? Because if you're right there, the whole thing has to go back, right? Actually, it doesn't go back, Your Honor, because Section 286 clearly precludes that evidence. There's only four types of evidence, as I was going to try to tell you, that can support the verdict in this case. The windmine evidence, that's gone because of the settlement agreement. The testing evidence of IFDC, that's gone because there's no evidence that any of that occurred within the six-year period required by Section 286. Is there something before us just to interrupt that? I mean, have you appealed that determination to let that evidence in? Yes, that was part of the JMAL that was brought in originally, Your Honor. Okay. Okay, so that evidence is in there. We've objected to it. It never should have came in, and it's clear that that evidence can't support a verdict. The third type of evidence is that their expert claims that, well, there's all this certification testing that went on, and that, therefore, they must have tested for the specific issue that's covered by Dr. Adams' patents. The problem with that is that there's no evidence in the record that any of that certification testing ever deals with the underrun, overrun error that's covered by Dr. Adams' patents. And when Dr. Adams' expert was pressed on that point at trial, he said, well, they must test for it because FCC testing, for example, one of the certification tests that he points out, tests for everything. Well, it tests for electromagnetic interference with other devices. It doesn't test for the overrun, underrun data corruption error that is Dr. Adams' patents. I'm getting a little confused. I mean, Judge Moore asked about the spoliation, and I had a similar question. But you seem to be saying here that forget the spoliation. I mean, even if the instruction were fine, you should just wipe out this trial and fine for us because there was no appropriate evidence before the jury on which it could have based any damages. Absolutely, Your Honor. That's right. Now, going to the spoliation issue, so if I put aside the certification testing, and again, I urge the court to look at the record. He never actually looked at what ASUS tested. Their expert admitted he didn't look at ASUS test results. There was direct testimony by ASUS as to what its tests covered. They don't test for this particular issue, this overrun, underrun error. They did it only when they had this IFDC diagnostic tool in 2000, and the reason that they stopped doing it in 2000 was because Winbon fixed its chip. There was no reason to test for it anymore, and that evidence is in the record. Wait a minute. ASUS spent five years trying to patent the infringing test technology right up through 2005 with the PTO. Why isn't that circumstantial evidence that ASUS conducted some post-complaint testing in this country? Because that's not what that patent application was about. But if I don't agree with you on that, if I don't agree with you on that, why isn't it circumstantial evidence of testing? There's no circumstantial evidence of testing that a patent application is actual testing. That's not evidence, Your Honor. One, that's not what the patent application was actually about. If you look at, in the record, what the application was talking about, that's, again, a misnomer that the plaintiff consistently tried to put up and the district court judge bought. But now going to the final bit of evidence, the spoliation issue that Judge Moore asked about, that was something that the district court judge granted on an entirely improper standard of review. This was an issue that was referred to. He left out bad faith. What's that? He left out bad faith. Well, he left out bad faith, but more importantly, Your Honor, he didn't even apply the right standard. That was something that was put to the discretion of the magistrate judge. Unless that magistrate judge is issuing a dispositive sanction, the district court judge can only review that for clear error or being contrary to law. And the district court judge specifically found that the magistrate judge was not in clear error. And that's in Joint Appendix, page 17. He found that the magistrate judge had not made any error. What he did was he simply decided to do a de novo review, which is not proper in the Rule 72A. It should have been a Rule 72A analysis, not a Rule 72B. And by doing that, he applied the wrong standard to begin with. So you can immediately eliminate the sanction in this case, Your Honor, because the district court judge simply decided to impose his own judgment for that magistrate judge when he was not allowed to do so by statute. But what that gets you to, though, is a new trial. And what you're telling us is that you shouldn't do that. The reason it would not get a new trial, Your Honor, is because this evidence can all be looked at as a matter of law. What evidence is actually in the record? If you look at what's in the record, there's nothing on the record that could support this particular verdict. As a matter of law, there's nothing that could support the verdict. In addition to what Judge Wallach talked about, on the exfoliation issue, yes, he didn't reach the bad faith finding, which is also required. He imposes a duty that probably isn't there. There are a number of issues that are a problem, but most systematic of that, under Section 28636, which gives the authority for the magistrate judge to decide this, once the magistrate judge, who had looked at all the evidence and had decided in his July order that no sanction was appropriate, that there wasn't actually any evidence of exfoliation, that despite what he had found a year earlier in his prior order, after looking at all the evidence that had been deduced during the case, he reached the conclusion that no sanction was appropriate. The judge at that point, the district court judge, is only allowed to review that for purposes of clear error or being contrary to the law. Instead, he imposed the wrong standard, and he gave it a de novo review. He was not allowed to do that. Well, you're into your rebuttal time. You saved a lot of it. I presume we can go to the cross-appeal, so why don't we hear from the other side. Okay, thank you. May it please the court, Gregory Phillips. I think one thing that's not in the brief that ought to be made clear is that Judge Stewart waited until the end of the trial, before he entered the sanctions order, until he heard the ASUS witnesses testify at trial. And it was on the day of the jury instruction conference that he entered his sanctions order and gave us the adverse inference jury instruction. Yeah, but he couldn't do that without bad faith. Yeah, doesn't the Tenth Circuit require us to find the bad faith? He found bad faith. He said that ASUS failed to present evidence and that the pinpoint precision with which it failed to preserve only certain evidence leads to the inescapable conclusion that it spoileated evidence. That's what he found at the end of trial. But he can also only make that finding if he is determining that the magistrate judge's determination otherwise was clearly erroneous. And there are all these statements in his opinion that there is no clear error in the magistrate judge's findings. Well, remember what the magistrate judge found. He found that they had spoileated evidence, including the source code. And he said that at trial... Why didn't he say that it wasn't willful? I don't think he said that it wasn't willful. He said that the conclusion that Judge Newport came up with was that we would be entitled to an adverse jury instruction at the time of trial. On page 4026, the evidence item list from other parties does not show that ASUS willfully spoileated its evidence. On the top of that page, the documents produced by other parties do not show ASUS destroyed the documents. And we objected... On the next page, on page 4028, it's not clear that ASUS spoileated evidence. Judge Newport said all of that. He said it could be dealt with with a jury instruction. No, but the magistrate judge expressly says does not show ASUS willfully spoileated evidence. So if you want me to flip, you've got to show me where the district court judge said that was clearly erroneous fact-finding. Because whether someone's willful or not is a fact-finding. We then objected to Judge Newport's second order. They objected to it and we objected to it as well and said that that was wrong. Show me where the district court said that was clearly wrong. Not wrong, clearly erroneous. But then what happened was then Judge Stewart waited before he ruled on both sides' objections until the last day of trial, until he could hear the ASUS witnesses testify at trial. And he then... I'll grant you he doesn't use the words it was clearly erroneous. No, he doesn't use the opposite words. He says the magistrate judge's fact-findings were not clearly erroneous. Not. What he said, remember there was two orders and this is from page two of Judge Stewart's order. The court finds that the March 30, 2009 sanctions order, so that was the first order where Judge Newport said there's all this evidence is missing. He said it is fully supported by the record that ASUS had a... So he said it was fully supported, the first order. I'm on page... Two. Right, where exactly? This is page two of his order, the first full paragraph. Page two of his order. Are you talking about the order... This is the 92710 order. That's the one I have, 92710. On page two of the order. On page two of the order. The court finds the March 30 is fully supported by the record. And remember that's the previous order where Judge Newport found that there was all this missing evidence. Absolutely. That's not the second one. But he doesn't say it was willful. And then he says that... He never says willful in that 2009. You're correct, but he says that it failed to preserve evidence and that the pinpoint precision with which it failed to preserve only certain evidence leads to the inescapable conclusion that it's spoileated evidence. So he's saying after listening to the witnesses at trial, the pinpoint precision that they are missing this testing evidence up through 2005 causes the district court to come to the inescapable conclusion that it's spoileated evidence. But he lets the magistrate's finding of no bad faith stand. What he found was that the case was exceptional and that he wouldn't grant us attorney's fees and costs because he'd already granted an adverse jury instruction that was sanctioned enough is the way he came down on that. Where does he eviscerate the finding of no bad faith? Where does he say that the magistrate's finding of no bad faith is no longer valid? He doesn't come out and say that directly, but what I just read to you says that where he says the pinpoint precision with which ASUS failed to preserve only certain evidence leads to the inescapable conclusion that it's spoileated evidence. Yes, but spoileated does not mean willful. You realize that, right? All of the 10th Circuit law says spoileated when they mean destroyed evidence you had an obligation to preserve, and then they say in contrast willfully spoileated evidence, which is what's necessary to trigger judgment and or an adverse inference instruction. So the fact that he said spoileated, look in Black Spoil Dictionary, spoileated doesn't mean willful. Willfully spoileated means willfully spoileated. But when you use the words pinpoint precision, that isn't it curious that the only evidence that ASUS But in two places in the opinion he said the findings were not clearly erroneous, and he says it expressly on page 10 with regard to the 2010 sanctions order. He says it appears in the 2010 sanctions order, blah, blah, blah, therefore the court finds no clear error. He said the court agrees that so severe a sanction is not warranted. The court also agrees with the 2010 sanctions order. This is where Judge Newford found that we were entitled to an adverse jury instruction that plaintiffs and ASUS should be able to argue the issue of the missing evidence to the jury. So in the 2010 sanctions order that Judge Newford entered, he said that we were entitled to an adverse jury instruction, an adverse inference, and that's what Judge Stewart is saying. The court agrees with the 2010 sanctions order, finding that plaintiffs should be able to… Are you telling me that you think the 2010 sanctions order of the magistrate judge stands for the proposition that you're entitled to an adverse inference instruction? That's what he – he talked about that in there, yes. No, are you telling me you read the 2010 magistrate judge's rule as standing for the proposition that you're entitled to an adverse inference instruction? Yes. Where? Right here in front of me. The last sentence of it, right at the conclusion, says the jury will consider these facts and draw their inferences, not, in contrast, saying the jury should draw adverse inferences. Right, the jury will – Adams is – Adams, if you go back one more page, the fact that ASUS no longer has the original source code for the test program they were trying to patent in the USPTO, and the reasons that it should – would have expected to have it will be in evidence. Adams can argue to the jury that ASUS should have the original source code to a program that it both patented and attempted to patent for many years. The jury will consider these facts and draw their inferences. Correct, the jury will draw their inferences, not, I will instruct them to adversely create an inference. That's a totally different ballgame. And you realize in the very next paragraph he twice says that there's no clear evidence of ASUS having spoliated evidence. I'll be honest with you. I think the magistrate judge and the district court judge are getting confused between spoliation and willful spoliation, and I think it makes it a little hard to understand exactly what they mean. As a result, it may be because you all obfuscated it to such a degree for them, quite frankly, but nonetheless, I don't see how you could possibly say that the magistrate judge's 2010 opinion stands to the proposition that he was instructing an adverse inference as appropriate. Well, that's what Judge Stewart did. No, no, no, but you understand. You appreciate that the language you read from the magistrate judge was not an adverse inference. No, I understand that, and the magistrate judge said you're going to be able to argue all this to the jury. We then object to Judge Newford's second order, as does ASUS. We fully brief that. Judge Stewart reserves ruling on that up until the last day of trial after he can hear the ASUS witnesses testify, and on the last day of trial right before the jury instruction conference, he then says the court also agrees with the 2010 sanctions order, finding the plaintiff and ASUS should be able to argue the issue of missing evidence to the jury. He says they spoileated the evidence, whatever that means, whether it's willful or not, with pinpoint precision. I don't know how you can not have bad faith if it's with pinpoint precision. Here's the problem. Even if I agree with you that he found bad faith, the problem is it's crystal clear the magistrate judge did not, and he didn't get to review it de novo, and to the extent he ever articulates the clearly erroneous standard in his opinion, which he does twice, both times he says there was no clear error in the decision below. That's the problem. I actually believe you. I believe you're right. I believe he thinks it was willful based on that pinpoint precision language. I read it the same way you're representing it. The problem is that wasn't his standard of review. To the extent he acknowledged the standard of review, he said they didn't clearly err. What he said was the 2009 order, the first order, where we said all of this evidence is missing, is fully supported by the record. And then he said he disagrees with the 2010, but I'm going to give you an adverse jury instruction. So I'll agree with you. Judge Stewart was not as articulate as he should have been in the 2010 order. But I think that's an important point. The other point that I think is really important, and it is crystal clear if you read the Sam Yang patent application that was in front of the USPTO, that it's a detector patent. It's not only for the solving of this issue, but for the detecting of this. And if you look at the final office action, which is... Whether or not there was something left for the jury to decide. I'm talking about Mr. Lemieux's statement that the Sam Yang patent application didn't have anything to do with the test program. And remember the only... But this takes us to the other issue, right? Right, right, yeah. Which is, let's assume we're contemplating that there was a problem with the evaluation question. Is there still, after the Winbon settlement, is there still something? The jury verdict, unfortunately by our standards, was not large to begin with, was not overwhelming to begin with. And now we're talking about a new trial. What exactly is left? Right, and so there's two points here. One, Judge Moore hit the nail on the head when she said, well, weren't they trying to patent this test program up through 2005? The jury could have inferred from that circumstantial evidence that there was testing in the US. No, but how? I mean, look, people file patent applications and stuff they haven't even reduced to practice. So how are you supposed to infer, and how can that be the only evidence of infringement? Well, they continue to patent. You didn't have anybody who testified, for example, that, well, almost all the time in this art, people are filing patent applications, they're testing it up until the day they file a patent. There was nothing. There was no basis upon which the jury could reach that conclusion. So I can't take judicial notice of it. No, our evidence was they were testing, our argument to the jury was they were testing in the United States, but they destroyed all the evidence, they spoileated all that evidence, and the way you can determine they were testing in the US is because Sam Yang was continuing to try to patent his test program with the USPTO up through 2005. And we also presented evidence, and this is very important, of testing other than on wind bond. We presented evidence. But unfortunately, it seems that that's all before the year 2000. That's the problem. Our experts testified at trial that the testing would continue as long as they kept producing the motherboards, and that the motherboards were still being used up at the time of trial. People still use FDCs today on your EKG machines when you go to a doctor and whatnot. And the testimony that our experts presented was this testing continues all the way up through the time of trial. It continues for the motherboards, it continues for the FDC, for WICL. If I agree with you that there is some evidence in here, but I disagree with you on spoliation, what happens in this case? I think that you then have to remand the spoliation issue back to the district court judge for a determination on whether he needed to be more articulate and whether it was willful. But I think the language with the pinpoint precision makes clear that he did think it was willful, and that's why he granted us an adverse inference instruction on the last day of trial. It was not just for the source code, but it was for any FDC-related evidence that was missing. Mr. Phillips, you're relying on your expert, Dr. Kraft, right? And Dr. Adams, who was also an expert. Dr. Kraft says, I'm almost quoting, if it wasn't in the test report, then there isn't any evidence. And yet you don't argue anywhere that the reference test report had any such information, did it? Well, Dr. Kraft also testified that the evidence related to my question. Is it the test report? Not the test report that they were referring to, but the test report that they destroyed had all of that in there. And Dr. Kraft testified that they did not produce the test results that all of the e-mails said existed relating to the testing for the FDC, and that was on Joint Appendix 4626 and Joint Appendix 4696-97. We'll concede that they didn't produce any test reports that their e-mail said existed relating to the testing for this issue. I think we have a couple more questions, even though your time is up. We have a couple more questions for you. And we'll give you a couple minutes for these to un-process here. But my question is, suppose that you're right that there exists some evidence in this record of non-infringement. How can I not vacate the damage award? Because the damage award in this case was presented to the jury, including evidence of infringement of the Winn-Bon chips, and the Winn-Bon chips were settled. So to the extent that the jury determined the damage award, it would necessarily have had in front of it, and when it was making its determination, it would have been considering damages attributable to those Winn-Bon chips, and they shouldn't be on the hook for those. That's gone. That's out of the case. Let me answer the question. Remember, the jury found for us on the 002 patent, which was a testing patent. It didn't find for us on that ASUS was importing in infringing chips. And so the Winn-Bon settlement, if you read it carefully, it only relates to the importation and use of Winn-Bon chips. It doesn't even cover ASUS's testing of Winn-Bon chips. That's not in there. And so the 002 patent, the jury found that ASUS and ACI had tested not only Winn-Bon chips, but VIA chips, FMSC chips, National Semiconductor chips, and all of that. And so the damage in the report has nothing to do with the import. All of that evidence with regard to testing of chips other than Winn-Bon chips, it was presented to the jury? It was, and I can give you the citation for that. This Joint Appendix 7181, which is Exhibit 194, talks about testing of FMSC chips, and Trial Exhibit 78, which is Joint Appendix 7306 through 08, talks about the testing of SMSC, FMC, VIA, and CIS chips. I'm confused, but my clerk just sent me the language. It covers all Winn-Bon customers for sales, offer for use, use, importation of Winn-Bon products. But not for testing. Wait, why wouldn't the testing be a use? Because when you use the chip, you put it in a motherboard, and you sell it to... You've got to be kidding me. You're going to say that when you're testing to see if it works properly, you're not using it? Of course you're using it. Our case law actually says that for infringement purposes. We have lots of infringement cases that say when you test something, you're using it under the infringement law. And you've got a license that says it covers any use of the Winn-Bon products. Right, but it doesn't cover the testing. I hear what you're saying, but even if you're right, it still doesn't deal with the evidence that we presented on SMFC, SMC, VIA, and CIS chips. I guess that's my point. My point is you've got a bunch of evidence to the jury on Winn-Bon use, and the damages that ought to be attributed for that. They would have been considering that when they read their damages verdict. You've got it. You're going to have to have a new trial in this case if that's the case. Because you're going to have to have a new trial on minimum one damages. But remember, with respect to ACES, the jury only found on the 002 patent, which was for testing. It didn't find on the other patents for importing the infringing chip into the… Yes, but they were testing the Winn-Bon chips, and that they're allowed to do under the license. I disagree. But they were also testing SMFC and VIA and CIS chips as well. We're well into over your time. Why don't we give you three minutes to deal with your cross-appeal, and then we'll restore a couple minutes for rebuttal on the cross-appeal issue. You want me to do the cross-appeal right now? Yes. Okay. Very briefly, the 2004 email that was written to Winn-Bon, not ACES, asked Winn-Bon, look, we have potential theft here. It's not addressed to ACES, and we then wait for Winn-Bon to respond. Four months later, Magistrate Judge Neufer, in the Gateway case, says, you cannot rely on third-hand information, and you're going to have to wait until you get more information. He then produces documents to us that had been produced to him in camera on September 15, 2004. Here's the problem I'm having. On the statute of limitations, the case law says, does it not, that doubts are questions about defendants' actions that put them on notice for further inquiry. And it seems to me, if you look at the email or the note that goes back to March, where, I mean, there's quite strong language in that with regard to, due to the legal ramifications and the potential theft. Directed towards Winn-Bon, but not towards ACES. And then we have the magistrate judge, four months later, saying, you can't use the evidence that you have so far because it's unreliable. It's third-hand information. You can't rely on that. And it's not until a couple of months later that he then produces the YC Wound Test Report on September 15, 2004, that we start even having an inkling about ACES. And then we send a letter to ACES general counsel saying, what about this? And they come back and say to us, oh, we're not cunning thieves. We respect intellectual property rights. And so, at summary judgment, you have to draw all the inferences of that email in our favor. And our point is that when you look at that email in the context of what was going on in 2004, not ten years later at trial, there's still issues of fact that the jury needs to resolve. And we wouldn't have wanted to be threatened with the Rule 11 sanctions for filing a complaint until we had evidence. And parties tried to sanction us twice in this case for doing similar things. So if you apply the summary judgment... The notion of the claim accruing earlier? No. Clearly. How can you? What about Mollett and McCollin versus census, page 1124, where it, quote, all that's required to trigger the statute of limitations is sufficient information to apprise the plaintiffs of the underlying cause of action so as to put them on notice to make further inquiries. How is this not showing you're on notice to make further inquiries? You talk about there having been a potential theft involved. If that's what triggers the statute of limitations... But that McCollin case we distinguish in our brief... No, you distinguish it from what was it, Reynolds? But that's not a case applying Utah law. And this is a state law question. As I recall, the McCollin case was a federal court case applying Utah law. Right. And it dealt with... A different federal court case not applying Utah law. And it dealt with issues relating to, as I recall, pain and suffering from an implant in there, which is different from the Utah case law that says you have to have either knowledge or constructive knowledge, is what the statute says, not inklings or suspicions. Can I just make one other point just on your first response to me about that e-mail that was the March e-mail? Right. You're right. It was sent to Winbon. Right.  And then you talk about we want to exonerate your client, Winbon, suggesting that we know there's a problem with regard to ACES here. Is that an unfair reading of this e-mail? It's directed towards Winbon and says we need to get to the bottom of this. We think there may be potential theft involved. But it calls out ACES in the e-mail, right? It calls out... You're right, but I don't know that I construe your duty under Utah law in terms of what you had a reason to know or be curious or have doubts about necessarily matters who you sent the e-mail to. It was a question of what you knew and what you thought at the time, and this e-mail does deal with ACES, correct? It mentions ACES, correct. But remember four months later, Judge Newford said in dealing with the same issue with respect to this test program, all you've got is third-hand information that's unreliable. And when a United States magistrate judge tells you that, you take that seriously. Well, we'll restore a couple minutes of rebuttal just on the cross-appeal issue, and we'll back to you, Mr. New. We're way over any parameters. So let me give you, you had left a total of a couple minutes, what, five minutes before. We'll add another four or five minutes if you need it for purposes of your own rebuttal and response to the cross-appeal. Don't feel compelled to use that. I don't, Your Honor. Let me just make that clear. In terms of the cross-appeal, the McClellan and the McKinney cases speak directly to Utah law at this point. Utah law is different. He's right. They're federal cases interpreting Utah law. And I tell you, when I have to interpret a state's law and they haven't made it clear what the rule is, I feel a little itchy about it. Except that the cases that are cited in the McClellan and the McKinney cases are actually Utah decisions by the Utah Supreme Court. And if you read the language in those two decisions, it says the Utah Supreme Court, every single time this kind of circumstance has come up, has found that the statute of limitations has been triggered. And that's a direct quote from, I believe, the McKinney case, Your Honor. So I think if you look at those two cases, you'll find that it is applying Utah law. Utah law says if you've got sufficient suspicion, here they're making a public statement that they believe that our client had stole something from them. They've identified who they thought stole it. They've identified what they thought was stolen. That's clearly sufficient to trigger the statute of limitations. You're talking about the email of March? That's right, the March 2004 email. He didn't talk about this, but it is in their brief. Clearly on the award of attorney's fees, that's an abuse of discretion standard. The judge in this case gave a reasoned decision, unlike some of the other decisions, gave a reasoned decision as to why, even though he found it to be an exceptional case, it was not deserving of an award of attorney's fees and that the other sanction was sufficient. That's an abuse of discretion. I don't think this court can overturn that in this circumstance. If we end up sending it back, then he can reconsider that. It seems to me, if I remember, the reason he didn't award attorney's fees is because he said the adverse inference was enough. That's a pretty big penalty, but if we tell him the adverse inference was wrong, he may well reconsider it. Rather than adverse inference, he might get attorney's fees. He needs to have a chance to re-look at that. If the case was sent back around, I would agree that he would have the opportunity to revisit that issue. The reason that I'm going to suggest... If we have a new trial, there's no prevailing party anymore. That is correct. The reason I'm going to suggest, Your Honor, that the case shouldn't be... It should be simply reversed in this instance. If you look at the evidence here, what was the evidence? They claim it's our testing. ASUS testing is what they claim violates their patent, the 202 patents. It can't be testing of WinBond devices. That's clearly covered by the settlement agreement and license granted by WinBond. It can't be the testing of using IFDC.exe because there's no evidence of that use past the year 2000, when WinBond actually changed the chip. Well, you say there's no evidence of the use, but the evidence is they were continuing to patent it, and they've got an expert that says any time you're continuing to have these things, you're going to be continuing to test them. Why isn't that enough? Because the patent application, again, is not related to the IFDC.exe tool. This is a constant refrain. But you're continuing to sell the motherboards, right? We sell motherboards. That's right. But we don't test them. This is the part that's tested for... But their expert says whenever you're continuing to sell them, you're still testing them. But what does that expert really say? What he's saying is testing. He says, one, I didn't actually look at ASUS's tests, so I can't really tell you what they said. So if it's not in there, it's not there. And he admitted he never looked at the ASUS testing. He says, but there's certification testing. And certification testing, whether it be FCC, WICL testing, CE testing, all of that tests for everything, and therefore they must have tested for the overrun, underrun condition, which is the subject of his patents. FCC testing doesn't test for that. It tests for electromagnetic interference. So does CE testing. WICL testing tests for Windows functionality. If those tests actually tested for what... Yeah, but that stuff's not all in the record. No, that isn't a record. What he's... This is the evidence... Well, it sounds to me like a question of fact for the jury. This is the evidence that's in there. But it sounds like a question of fact for the jury. Does that include this sort of testing or not that sort of testing? Well, no, that's the problem. We asked the expert, Your Honor, at trial, how does he know that WICL testing tests for this? And he said, I didn't actually look at the WICL testing. I don't know. It just must test for it. So, again, if the jury's believing that, that's not a sufficient basis. But it must test for it. It's the expert's belief that this test must be being performed because you're selling the motherboard. But the expert's testimony has to be tied to some objective evidence. It can't be blank speculation, which is all that this was. Can I just, before your time runs out, just one remaining question about the foliation. If we agree with you for all the reasons we've discussed today, that the district court wasn't sufficiently clear and it was certainly ambiguous because he didn't find there was any clear error, is it your view that we throw out the adverse inference and go to a trial, assuming we need a trial, or that we give it back to the district court for a duo, that we say there's a lack of clarity in what you said? No, I don't think there's a lack of clarity, Your Honor, in what the judge did. The judge simply said he was going to review it, and he was going to review it on a de novo basis. That was wrong. So the sanction isn't supportable because the judge... Right, but we don't know what he would have decided if he reviewed it under the correct basis. Actually, we do, because he made a statement in the record that he found there is no clear error. Those statements are so clearly in conflict. He said in the one point, the pinpoint accuracy with which they destroyed the most important evidence in the case... But let's take a look at that, Your Honor. He's talking about the source code for the ifdc.exe tool. Source code can't infringe. What infringes is the executable code. This patent covers a device... The source code contained notes, which all programmers put in that original source code, that would show the problem. Well, Your Honor, if the executable code itself, if the tool itself does not infringe, it doesn't matter what the source code says. That source code may have been relevant to a trade secret issue, if they're trying to claim that it was a trade secret issue. But the source code, he says, you know, I believe he is on record as stating, it's a stipulated fact on the record, that he never shared his trade secrets with anybody until May of 2000. This tool was developed by ASUS by January of 2000, five months before Dr. Adams ever shared his secrets with anyone. But I read his opinion as quite clearly saying that you did it willfully, you did it in bad faith. And I read his opinion that way, but I'm troubled by the fact that he clearly didn't apply the right standard of review, which is what you started with. So why don't we give it back to him and let him reconsider whether you're so clearly willful that any finding to the contrary is clearly erroneous. Because, Your Honor, it is not his decision, it was Judge Neuffer's decision. No, he gets to review it. He can review it for being clearly erroneous or contrary to law, and he's already stated that it wasn't. No, he actually said the findings below were not clearly erroneous, but then he went on and found you willful. Well, I guess, Your Honor, I guess we have a big difference. If he says it's not clearly erroneous, I believe, then, he's looked at the proper standard at that point. If he says it's not clearly erroneous and you think he looks at the proper standard, he wouldn't have issued the adverse inference instruction. Clearly, the man got something wrong. I mean, that's why I'm asking your question. There were many things wrong in this case, Your Honor, including a lot of evidentiary issues. However, I don't think this case needs to go back for a new trial. Because, again, there is no evidence in the record that could sustain this jury's verdict. There is no legitimate admissible evidence that can sustain this jury's verdict. I think we have your argument. Final two-minute answer on the cross-examination. I just have two brief points, unless you have any questions. The first is, both Dr. Kraft and Dr. Adams testified that ISDC... Is that the cross-examination? No. Yeah, you can't touch it. No, because this is a time on the cross-examination. Okay, well, okay. Fair point. There's a substantial difference between suspicion of a problem with an implant in your body and this case. And, as it was, the state of the record in 2004, when the email was written, was that Gateway said that Winn-Bond used something that they claimed they got from ASUS. And that's either third or fourth hand. Then the magistrate judge saying, that's not reliable enough. And when you use the prism of the... Is it reliable writing letters saying that people are committing crimes based on what you think is unreliable information? I don't think that email said there was a crime. I think it says... Potential theft. Potential theft. Isn't that a crime? I'm sorry. It could be referring to theft of trade secrets. But due to the legal ramifications and potential theft, we want to find out what's going on. It also says we can exonerate your client, which is another kind of heavy-handed term. Absolutely. But the standard is you have to draw all of the inferences in Dr. Adams' favor on summary judgment and let the jury decide what that means. You're putting yourself right now in the position of the jury and drawing the inferences in ASUS' favor. Well, it's not really the same question. I don't want to belabor it. We're talking about a statute of limitations question, which isn't necessarily... I mean, the judge gets to make the decision on statute of limitations. I'm not sure how the inferences play with regard to that determination. But that's covered in the briefs. I think we have the argument. We thank both counsel. Thank you very much.